712 So.2d 946 (1998)
STATE of Louisiana
v.
Eric GRESHAM.
No. 97-KA-1158.
Court of Appeal of Louisiana, Fifth Circuit.
April 15, 1998.
*947 Bruce G. Whittaker, Louisiana Appellate Project, Gretna, for Appellant Eric Gresham.
*948 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant District Attorney, Research and Appeals, Gretna, for Appellee State of Louisiana.
Before GRISBAUM, DUFRESNE and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, Eric D. Gresham, appeals his conviction of armed robbery. We affirm his conviction, adjudication as an habitual offender and sentence.
On October 16, 1996, the Jefferson Parish District Attorney filed a Bill of Information charging defendant with two counts of armed robbery, a violation of La. R.S. 14:64.[1] At the arraignment on October 24, 1996, defendant pled not guilty. He filed a motion to suppress the evidence and confession on October 25, 1996. After a hearing on April 7, 1997, the trial court denied defendant's motion to suppress. On the same day, the state severed count one, and jury selection began. Defendant was tried before a jury of twelve persons on count two on April 8th and 9th, 1997. The jury returned a verdict of guilty as charged on April 9, 1997, by a vote of ten to two. On April 25, 1997, the trial judge sentenced defendant to serve forty years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On the same date, the state filed an habitual offender Bill of Information, alleging defendant to be a third felony offender.
On April 29, 1997, defendant filed a motion for appeal, which the trial court granted on May 1, 1997. The habitual offender hearing was held on September 19, 1997 and the trial court took the matter under advisement. On November 7, 1997, defendant was adjudicated a third felony offender. After vacating defendant's previous sentence, defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.[2]
Officer Chris Gordon of the Gretna Police Department and Jacqueline Billiot (Billiot) testified at the hearing on the motion to suppress. Officer Gordon testified that on September 9, 1996, at approximately 1:00 a.m., he responded to a call regarding an armed robbery at the Burger King located at 78 Westbank Expressway. He was advised that the suspects were two black males and that the robbery had been committed with a gun. On the way to the Burger King, Officer Gordon observed two black males walking away from the Burger King, through the parking lot of 90 Westbank Expressway, approximately a block and a half away from the crime scene. Officer Gordon stated that he stopped his car and saw that Officer Guidry was nearby. He and Officer Guidry ordered the two suspects to stop and place their hands on the hood of the car. Defendant asked what was happening and Officer Gordon responded that they were investigating an armed robbery. Officer Gordon testified that defendant replied, "Man, that wasn't me. I'm just going over to Rally's." Officer Gordon patted down defendant and Officer Guidry patted down the other man, Narcisse. Officer Gordon testified that the pat down was done "due to the robbery being with a weapon ... to make sure they didn't have a weapon on them, for our safety." Officer Gordon stated that as he was patting defendant down, he felt "something hard" in defendant's front right pocket. The officer stated that he removed a roll of quarters and a roll of pennies from that pocket. Officer Gordon said that he removed these objects because "when [he] felt it was hard, [he] didn't know what it was, and it's always possible it could have been a small weapon." He continued to pat down defendant and felt another object in defendant's right rear pocket, "protruding through the pocket, up underneath his T-shirt." The officer removed removed this object and discovered that it was a roll of garbage bags. He testified that he "couldn't feel exactly what *949 the object was" when he was patting defendant down.
Officer Gordon testified that he advised his lieutenant of the situation and the lieutenant told him to release the subjects because since the robbers wore scarves or bandanas over their faces, the victims were unable to identify the robbers by their facial features. The officers returned the property and then released defendant and Narcisse. Defendant and Narcisse then walked away. Thereafter, Officer Gordon continued to search the area for suspects and Officer Guidry returned to the Burger King. Officer Gordon testified that while Officer Guidry was at the Burger King, one of the victims told him that the robbers took a roll of garbage bags during the robbery. When the victim showed Officer Guidry the kind of garbage bags that had been taken, Officer Guidry recognized them as the same kind of garbage bags which defendant had in his pocket. Officer Gordon stated that they then went to search for defendant and Narcisse again.
Officer Gordon testified that defendant and Narcisse were apprehended about ten minutes later. He and Officer Guidry brought them to the Burger King for identification. Officer Gordon and Officer Guidry stood outside of the drive-through window with defendant and Narcisse and a spotlight was shone on them. Officer Gordon testified that his lieutenant was inside with the victims and indicated that defendant and Narcisse were positively identified.
After argument by counsel, the trial court denied the motion to suppress the evidence, stating the following reasons:
THE COURT:
All right. I have no problem with the stop and frisk. I think the stop was appropriate. I think that frisk was also appropriate I think that the law is not whether they think there's a weapon; the law is whether or not the officer reasonably feels he is in physical danger. I think the roll of coins could put him in reasonable danger. Certainly a rolled up something in the back, even though the outside of it feels soft, there could be something in it. I have no problem with them removing both the coins or removing the rolled up garbage bags; therefore, the Motion to Suppress the Evidence is denied; and we'll go forward with the rest of the Motion to Suppress the Identification. (R., p.227)
Relative to the motion to suppress the identification, Billiot testified that she and Earl Jackson were working at the Burger King at 78 Westbank Expressway on September 9, 1996. She stated that on that night, two black males robbed the Burger King and hit her in the head. She stated that she didn't see either of the perpetrators' faces at the time of the robbery because both of them wore "handkerchiefs" over their faces, up to their eyes and they were also wearing hats. Billiot testified that she called the police after the robbery and that she was very upset when the police arrived. She did not recall what she had told them. She testified that approximately ten to fifteen minutes later, the police returned with two people and told her they wanted her to "look at" them. She looked at them through the store's front window, as well as the drive-through window, but could not remember whether or not she positively identified these two people. Finally, she testified that the police did not tell her whom to select or try to influence her in any way.
After argument by counsel, the trial court noted that Billiot did not state that she had identified defendant, but ruled that the identification procedure itself was not "faulty."
At trial, the state presented the testimony of Officer Gordon, as well as Officer Starlett Cuzzort, Officer Hebert Estee, Officer Guidry and Billiot. Officer Gordon's testimony at trial was substantially similar to his testimony at the suppression hearing. However, he additionally testified that, to his knowledge, no gun was ever recovered and that Officer Estee was the officer who actually found defendant and Narcisse the second time at 929 Westbank Expressway. Officer Gordon went to that location to assist Officer Estee.
Officer Estee of the Gretna Police Department testified that he is a narcotics and canine patrol handler. He was accepted by the trial court as an expert in this field. He *950 testified that on September 9, 1996, he responded to a call regarding a robbery at the Burger King. He arrived with his canine partner, Marco, approximately 45 seconds after receiving the call. When he arrived at the Burger King, he saw that two subjects had been detained at 90 Westbank Expressway. He started a "search" with Marco at the rear of the Burger King. When Marco reached 90 Westbank Expressway, he started "spinning around in a circle." Officer Estee testified that the "track" ended where the two suspects had initially been detained. Officer Estee notified his lieutenant of his findings and the lieutenant instructed him to attempt to locate the subjects. Thereafter, Officer Estee began searching for the subjects in his patrol unit. At approximately 1:30 a.m., he observed defendant and Narcisse at 929 Westbank Expressway. Officer Estee stopped and advised the subjects that he was investigating an armed robbery. The two men told him that they had just been stopped by other officers. Officers Gordon and Guidry then arrived on the scene and Officer Estee put Marco on an "article search," or a search to find any object with a fresh human scent. In a flower bed at 80 Westbank Expressway, Marco located a clear, plastic bag filled with U.S. currency.
Officer Guidry testified substantially the same as Officer Gordon at trial and at the suppression hearing. At trial, he testified that on his way to the Burger King, he saw two black males walking westbound from the direction of Burger King. He said that they looked at him and then "hurried up and tried to walk away nonchalantly." Officer Gordon stopped. Officer Cuzzort began to stop, but she proceeded to the Burger King. Officer Guidry testified that he patted down Narcisse, while Officer Gordon patted down defendant. Defendant and Narcisse were subsequently released, but later were apprehended as a result of the garbage bags.
Officer Cuzzort of the Gretna Police Department testified that she too responded to the armed robbery call. She stated that she observed two subjects as she was on her way to the Burger King, but saw that Officer Gordon and Officer Guidry had stopped, so she proceeded to the Burger King. When she arrived, she noted that there were two victims, a man and a lady. The lady had been struck in the head and was "hysterical." The victims said that the gunman wore dark blue jogging pants, was thin and wore black tennis shoes. The other man wore stonewashed shorts and a white T-shirt. Both were wearing bandannas on their faces, over the nose and under the eyes. The record reflects that Officer Gordon identified state's exhibit three as a pair of blue jean shorts that defendant wore that night.
At trial, Billiot's testimony was more detailed than at the suppression hearing. She stated that the Burger King was closed and that she and Earl Jackson (Jackson) were there. At approximately 1:00 a.m., she saw a light-colored van pass through the drive-through. Two men exited from the van and it drove away. A short time later, she saw two men standing at the back door, which was glass. One of the men had a gun and he told her to open the door, which she did. After they came inside, they demanded money and she gave them a deposit bag containing money. The man with the gun told her to get more money. Billiot attempted to open the safe. She testified that he kept asking why she was "stalling." When Ms. Billiot replied that she was not stalling, the man hit her with the gun in the head so hard that he knocked her glasses off and an earring out of her ear. Meanwhile, the other man was holding Jackson and said, "Shoot that white bitch!" After the robbery, the gunman ordered her to crawl to the cooler. Jackson was also placed in the cooler.
Billiot testified that it seemed like they were in the cooler for an hour, but it was probably more like five or ten minutes. She stated that she was treated at a hospital that night for an injury requiring nine clamps in her head. The witness could not remember what she told the police or what the robbers were wearing, except that they were wearing bandannas over their faces.
Next, the jury was taken to view the scene and the state rested its case. The defense's only witness was Robert Tucker (Tucker), who was apparently called for the purpose of impeaching Billiot. Tucker testified that he was a private investigator hired *951 by the defense. He stated that he interviewed Billiot and she told him that it seemed like she was in the cooler for "maybe half an hour, but it was less than that." He further testified that she made a subsequent statement to him that it was five or ten minutes at the most. On cross-examination, Tucker stated that Billiot did not seem to be lying or to have anything to hide. After both sides rested, the jury found defendant guilty as charged.
On appeal, defendant asserts as error that the trial court erred in denying the motion to suppress. Defendant also asks for a review for error patent.
In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence produced at the hearing on the motion to suppress, but may also consider pertinent evidence given at the trial. State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 127, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Byes, 94-611 (La.App. 5th Cir. 12/28/94), 648 So.2d 1073, 1074.
In this case, defendant does not challenge the validity of the investigatory stop. Rather, defendant challenges the pat down frisk leading to the removal of the roll of coins, on the grounds that Officer Gordon did not have an articulable belief that he was in danger so as to justify the frisk. Defendant further contends that Officer Gordon's removal of the roll of coins was unlawful because the roll was not immediately identifiable as contraband under the "plain feel" exception set forth in Minnesota v. Dickerson.[3] The state, on the other hand, contends that the pat-down and removal of the objects from defendant's pocket was justified because Officer Gordon reasonably suspected that he was in danger.
The Fourth Amendment to the United States Constitution and La. Const. Art. 1, § 5 protect individuals from unreasonable searches and seizures. State v. Belton, 441 So.2d 1195, 1198 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). However, the right of law enforcement officers to stop and question a person where there is reasonable suspicion to believe that the person is committing, has committed or is about to commit a crime was established in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See also: State v. Keller, 403 So.2d 693, 696 (La.1981); State v. Duran, 96-602, (La.App. 5th Cir. 3/25/97), 693 So.2d 2, 3, application dismissed, 97-1485 (La.1/9/98), 705 So.2d 1087. The requirements for a valid Terry stop and for any search incident to the stop was codified in La.C.Cr.P. art. 215.1, which provides in pertinent part:
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.
When a police officer observes conduct which leads him to reasonably conclude that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous, he is entitled to conduct a carefully limited search to discover weapons that might be used to assault him, in the course of the investigatory stop. Terry v. Ohio, 88 S.Ct. at 1884-1885; State v. Tolliver, 556 So.2d 166, 169 (La.App. 5th Cir.1990). The pat-down is justified under circumstances where a reasonably prudent man would be warranted in the belief that his safety or that of others was in danger. State v. Keller, 403 So.2d 693, 697 (La.1981); State v. Edwards, 630 So.2d 302, 304 (La.App. 5th *952 Cir.1993). See also: State v. Mitchell, 96-999 (La.App. 5th Cir. 3/25/97), 692 So.2d 1251, 1252. The officer's belief is not reasonable unless the officer can point to particular facts from which he reasonably inferred that the individual was armed and dangerous. Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968); State v. Hunter, 375 So.2d 99, 102 (La.1979); State v. Edwards, 630 So.2d at 304. It is not necessary that the officer establish that it was more probable than not that the detained individual was armed and dangerous. Rather, it is sufficient that the officer establishes a "substantial possibility" of danger. State v. Hunter, 375 So.2d at 102; State v. Edwards, 630 So.2d at 304.
In the present case, Officer Gordon testified that it was approximately 1:00 a.m. when he responded to a call regarding the armed robbery at Burger King. When the call was dispatched, he was told that the suspects were two black males and that the robbery had been committed with a gun. Only 30 to 45 seconds had elapsed between the call regarding the armed robbery and when Officer Gordon spotted defendant and Narcisse at 90 Westbank Expressway, a block and a half from the Burger King. The officer further testified that defendant and Narcisse were walking away from Burger King and that they were the only two black males in the area. When Officer Gordon initially approached them, defendant told the officer that he was going to Rally's. At trial, Officer Gordon testified that Rally's was in the opposite direction from the direction from which defendant was walking. He patted defendant down because the robbery had been committed with a weapon. Officer Gordon testified that defendant did not refuse to cooperate.
In State v. Wesley, 28,012 (La.App. 2nd Cir. 4/3/96), 671 So.2d 1257, writ denied, 96-1127 (La.10/4/96), 679 So.2d 1379, an officer heard a call regarding an armed robbery at 2:25 a.m. The suspect was reported to be a black male wearing a ski mask, brown jacket, black pants and armed with a pistol. Near the scene and shortly after the call regarding the robbery, the officer observed a car occupied by two black males. The occupants were acting suspiciously inside the car and the car weaved on the road. The officer then stopped the car, ordered the suspects out of the car, handcuffed them and patted them down. The pat down revealed a silver pistol that had been concealed on defendant's person. After finding the initial stop to be justified, the Wesley court held that because "a gun was used in the robbery and the time of night, the officers were justified, for their own protection, in ordering the two occupants from the car, in handcuffing them for their security and in a pat-down for weapons." Id., at 1259.
Here, the armed robbery occurred in the early morning hours, at approximately 1:00 a.m. The robbery was reported to have been committed by two black males with a gun. Thirty to forty-five seconds later, Officer Gordon observed two black males, the only ones in the area, walking away from the scene of the robbery. When stopped, defendant told the officer that he was going to Rally's, but Rally's was the opposite direction from which defendant was walking. Considering all of these circumstances, we find that Officer Gordon was reasonable in his belief that his safety was in danger and that the pat-down of defendant was justified.
Defendant also contends that, even if the officer were justified in patting down defendant, the removal of the roll of coins in defendant's front right pants pocket exceeded the scope of that pat-down. Defendant cites Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), and other jurisprudence dealing with the "plain feel" exception. However, Minnesota v. Dickerson, applies to the seizing of contraband. There, the United States Supreme Court extended the rational from the "plain view" doctrine to the "plain feel" doctrine. See: Minnesota v. Dickerson, 113 S.Ct. at 2137. This Court adopted the "plain feel" doctrine in State v. Mitchell, 692 So.2d at 1253-1254 and State v. Stevens, 95-501 (La. App. 5th Cir. 3/26/96), 672 So.2d 986. In Dickerson, the officer affirmatively testified that the object he felt appeared to him to feel like cocaine. Here, the officer testified that he felt a hard object that he couldn't identify, but that could have been a weapon, not contraband. *953 As noted earlier, La.C.Cr.P. art. 215.1(B) applies to a pat-down for weapons and permits a frisk for weapons after a valid investigatory stop when the officer "... reasonably suspects the person possesses a dangerous weapon ..."
Officer Gordon testified at the suppression hearing that he "felt something hard in his [defendant's] front right pocket." When questioned on direct examination at the suppression hearing as to why he removed that object, he stated, "`Cause when I felt it was hard, I didn't know what it was, and it's always possible it could have been a small weapon." (R., p.195) On cross-examination, the following exchange occurred:
Q. You patted down Gresham?
A. Yes.
Q. All right. And you said you felt something hard in his pocket.
A. Correct.
Q. Was that in his front pocket?
A. Yes.
Q. At that time, did it feel like a gun to you?
A. I wasn't sure of what it was at all.
Q. Well, no. My question was, "Did it feel like it was a gun?"
A. It felt like it could possibly be one.
B. All right. A roll of quarters felt like a gun?
MR. SINHA:
Objection. He's already answered the question.
THE COURT:
He's on cross. You can ask.
MR. ARMATO:
Q. Did it feel like a knife?
A. I had no way of knowing what it was.
Q. No, the question was, "Did it feel like a knife?"
A. No, it didn't feel like a knife.
Q. All right. You also patted down the back of his pants?
A. Yes.
Q. And you felt something there. Was that hard?
A. It was round and hard.
Q. Did that feel like a gun?
A. Not that object, no.
Q. Did it feel like a knife?
A. No.
Q. Did it feel like a stick, or any-did it feel like any other weapon that you can articulate?
A. In my mind, at the time, it could have easily been something hiding a weapon, with it inside, to where I wouldn't be able to feel it, feel the shape of it; it could easily be done.
(R., pgs.204-205)
In this case, the testimony shows that Officer Gordon performed the pat-down in concern for his safety and that he thought that the object he felt could have been a weapon. As noted above, is not necessary that he establish that it was more probable than not that defendant was armed and dangerous. It is sufficient that the officer establishes a "substantial possibility" of danger. State v. Hunter, 375 So.2d at 102; State v. Edwards, 630 So.2d at 304. Thus, we find that the trial judge did not err in denying the motion to suppress the evidence.

ERROR PATENT
La.C.Cr.P. art. 920 provides: "the following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Boudreaux, 95-153 (La.App. 5th Cir. 9/20/95); 662 So.2d 22, 28.
Our review reveals one patent error. Defendant was not advised of the three-year *954 time limit for filing an application for post conviction relief, as required by La.C.Cr.P. art. 930.8. This article dictates that, except under certain limited circumstances, a defendant must file his application for post-conviction relief within three years after his judgment of conviction. Section C provides that the trial judge shall inform defendant of this prescriptive period at the time of sentencing. However, the failure to inform the defendant is not a ground for vacating the sentence. Rather, the remedy is to remand the case with an instruction to the trial judge to inform defendant of the provisions of article 930.8 by sending written notice to defendant within ten days after the rendition of this opinion and to file written proof in the record that defendant received such notice. State v. Birden, 675 So.2d at 1190-1191; State v. Crossley, 94-965 (La.App. 5th Cir. 3/15/95), 653 So.2d 631, 636-637, writ denied, 95-0959 (La.9/15/95), 660 So.2d 459.
Accordingly, defendant's original conviction, his adjudication as an habitual offender and sentence are hereby affirmed. The case is remanded for the trial judge to inform defendant of the provisions of C.Cr.P. article 930.8 by sending written notice to defendant within ten days after the rendition of this opinion and to file written proof in the record that defendant received such notice.
CONVICTION, ADJUDICATION AND SENTENCE AFFIRMED; CASE REMANDED.
NOTES
[1] Edward Narcisse was also charged on the same day for the same robbery. The record appears to reflect that Edward Narcisse pled guilty to two counts of attempted armed robbery on December 13, 1996.
[2] On November 13, 1997, defendant filed a second motion for appeal, which was granted on November 17, 1997.
[3] Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).