807 So.2d 1090 (2002)
STATE of Louisiana
v.
Raymond BROOKS, Jr.
No. 01-KA-864.
Court of Appeal of Louisiana, Fifth Circuit.
January 29, 2002.
*1093 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Assistant District Attorneys, Gretna, LA, Counsel for State.
Margaret S. Sollars, Thibodaux, LA, Counsel for defendant-appellant.
Court composed of Judges EDWARD A. DUFRESNE, Jr., SOL GOTHARD and CLARENCE E. McMANUS.
McMANUS, Judge.
In this matter, we affirm Defendant's conviction for possession of cocaine, but vacate the trial judge's finding that Defendant is a third felony offender, and remand the matter to allow the State to re-try the multiple offender charge.

STATEMENT OF THE CASE
The Jefferson Parish District Attorney filed a bill of information charging the Defendant, Raymond Brooks, with possession of cocaine, a violation of LSA-R.S. 40:967(C). The Defendant pled not guilty at arraignment. On August 31, 1999, the trial judge denied Defendant's motion to suppress evidence. Also on that day, the trial began, but ended in a mistrial.
On November 16, 1999, a second trial commenced, and a six-person jury found the Defendant guilty as charged.[1] On November 22, 1999, the trial judge sentenced the Defendant to five years of imprisonment at hard labor.[2] The State filed a *1094 multiple offender bill of information against the Defendant alleging him to be a fourth felony offender, and the Defendant denied the allegations therein.
After a multiple offender hearing on December 19, 2000, the trial judge found the Defendant to be a third felony offender, vacated the original sentence of five years at hard labor, and imposed an enhanced sentence of life imprisonment without benefit of parole, probation or suspension of sentence. On March 26, 2001, the Defendant filed an application for post-conviction relief seeking reinstatement of his appeal rights, which the trial judge granted.

FACTS
Officers DeSalvo and Cerevola of the Jefferson Parish Street Crimes Division testified to the following facts at trial. At approximately 12:55 a.m. on March 17, 1999, Officers DeSalvo and Cerevola were patrolling the Shrewsbury area of Jefferson Parish. They parked their unmarked Crown Victoria in a vacant lot near the 3409 block of Lausat Street in Jefferson Parish. Due to complaints of narcotics activity, the officers were surveilling the nightclub located at that address, known as the 3409 Club. The officers saw three black males standing in a group outside of the club. The officers' attention then shifted to another black male, later identified as Defendant, whom they saw walking toward the nightclub. The Defendant stopped near the nightclub and waved his hand as if "signaling to get someone's attention." Shortly thereafter, another man emerged from the alley between the nightclub and a house. Officer Cerevola, who had more than ten years of experience with the Sheriffs Office, was looking at the two men through binoculars. He told Officer DeSalvo that he saw the two men engage in a "hand-to-hand" transaction. Thereafter, the Defendant turned around and walked away.
Believing they had just witnessed a drug transaction, the officers decided to conduct a field interview of the Defendant. The officers drove their car along the route Defendant had just taken and pulled their car in front of the Defendant at the intersection of Lausat Street and Shrewsbury. Officer Cerevola testified that he stopped the car, and Officer DeSalvo began to exit. According to Officer Cerevola, "as soon as he [Defendant] took notice of the car we seen (sic) his face light up likea lot of the area know (sic) what the front of a Crown Vic looks like, a white Crown Vic at that, and his face just lit up." Then, the Defendant started running. As the Defendant fled, Officer DeSalvo saw him place an object in his mouth. Officer DeSalvo began running after him, identified himself as a police officer, and requested that Defendant stop. The Defendant continued running, and as Officer DeSalvo caught up with him, he turned and punched Officer DeSalvo in the chest. Officer DeSalvo grabbed the Defendant, who continued to flail his arms and kick his feet. Officer Cerevola joined Officer DeSalvo in his efforts to restrain the Defendant, but because the Defendant continued to squirm, Officer Cerevola struck him in the stomach. At that time, an object flew out of the Defendant's mouth.
Officer Cerevola scooped up the object with a field interview card. Officer Cerevola testified that the object was an off-white rock that field-tested positive for the presence of cocaine. According to Daniel Waguespack, an expert forensic scientist, the substance that was turned over to him for testing was positive for cocaine.

ASSIGNMENT OF ERROR NUMBER ONE
As his first assignment of error, the Defendant argues that the trial judge *1095 erred by failing to suppress evidence obtained from an illegal arrest.
The Defendant contends that the cocaine should have been suppressed because the evidence was the product of an unlawful arrest. Specifically, he contends that his arrest resulted from an unlawful investigatory stop because the police lacked reasonable suspicion of criminal activity to justify an investigatory stop. The State responds that the circumstances established reasonable suspicion for an investigatory stop.
An investigatory stop, authorized by LSA-C.Cr.P. art. 215.1 and Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), must be supported by reasonable suspicion of criminal activity. Reasonable suspicion is something less than probable cause to arrest. Rather, it requires that officers have sufficient knowledge of the facts and circumstances to justify an infringement of an individual's right to be free of government interference. State v. Belton, 441 So.2d 1195, 1198 (La.1983); State v. Williams, 98-1006 (La. App. 5 Cir. 3/30/99), 735 So.2d 62, 70. The reviewing court must consider the totality of the circumstances, according deference to the inferences and deductions of a trained police officer that might elude an untrained person. State v. Huntley, 97-0965 (La.3/13/98), 708 So.2d 1048, 1049; State v. Duckett, 99-314 (La.App. 5 Cir. 7/27/99), 740 So.2d 227, 230. An officer's experience, his knowledge of recent criminal patterns and his knowledge of an area's frequent incidents of crimes, are factors that may support reasonable suspicion for an investigatory stop. State v. Martin, 99-123 (La.App. 5 Cir. 6/1/99), 738 So.2d 98. The reputation of a neighborhood as a high-crime area is an articulable fact upon which an officer may legitimately rely in making a determination as to reasonable suspicion for an investigatory stop. State v. Flagg, 99-1004, p. 8 (La.App. 5 Cir. 4/25/00), 760 So.2d 522, 527, writ denied, 00-1510 (La.3/9/01), 786 So.2d 117
In the present case, Defendant claims that the police lacked reasonable suspicion to support an investigatory stop because he had not committed any crime. Although the Defendant cites numerous other cases in his appellate brief to support his claim that reasonable suspicion was lacking, he fails to mention Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), a similar case in which the United States Supreme Court held that a defendant's unprovoked flight upon seeing the police, coupled with his presence in an area of "heavy narcotics trafficking," provided police with reasonable suspicion to justify an investigatory stop. The Court explained that
[h]eadlong flightwherever it occurs is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.
. . . .
And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to *1096 stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.
Illinois v. Wardlow, 120 S.Ct. at 676 (emphasis added).
Even before Wardlow, the Louisiana Supreme Court held in State v. Benjamin, 97-3065 (La.12/1/98), 722 So.2d 988 that there was reasonable suspicion for stopping a defendant who had fled at the sight of the police, reversing the Fourth Circuit's decision in State v. Benjamin, 96-2781 (La.App. 4 Cir. 11/26/97), 703 So.2d 192. In that case, officers were on routine patrol in marked police cars when they saw the defendant walking down the street. As the officers pulled alongside the defendant, he grabbed at his waistband and began running. One of the officers chased the defendant on foot while the other officer attempted to cut off potential escape routes. The defendant was eventually captured, and officers retrieved a gun, which defendant had abandoned during the chase. Id. at 194.
In reversing the appellate court, the Louisiana Supreme Court explained its rationale as follows:
This Court has previously ruled that flight from police officers, alone, will not provide justification for a stop.... This activity, however, is highly suspicious and, therefore, may be one of the factors leading to a finding of reasonable cause.... Given the highly suspicious nature of flight from a police officer, the amount of additional information required in order to provide officers a reasonable suspicion that an individual is engaged in criminal behavior is greatly lessened.

Here, Officers Rome and Pollard observed that Defendant, upon seeing the marked police unit, began to run away holding his waistband as if he were supporting a weapon or contraband. These objective facts known to the officers were sufficient to raise a reasonable suspicion that Defendant either was engaging or was about to engage in criminal activity and, thus, justified a stop.
The Court of Appeal ruled that because "it is not a crime to run from the police while clutching one's waistband," the stop was illegal. The Court of Appeal erred. Police to do not have to observe what they know to be criminal behavior before investigating. The requirement is that the officer have a reasonable suspicion of criminal activity.
Because we find that the officers had a reasonable suspicion of criminal activity on the part of Defendant, thus justifying an investigatory stop, the question of whether an "imminent stop" had occurred when Defendant abandoned the firearm, as held by the Court of Appeal, is moot.
State v. Benjamin, 722 So.2d at 989 (citations omitted; emphasis added).
Recently, the Louisiana Supreme Court found that reasonable suspicion existed for an investigatory stop based on defendant's attempt to flee at an officers' request for identification in State v. McDaniels, 01-K-305 (La.12/7/01), 803 So.2d 966 (per curiam). In McDaniels, the police requested that the defendant identify himself because they were unfamiliar with the defendant as being a resident of the housing project. The Court held that the recovery of "three bags of marijuana which the defendant abandoned by spitting them from his mouth" when one of the officers grabbed the defendant's arm established probable cause for defendant's subsequent arrest.
Applying these principles in the instant case, it is clear that reasonable suspicion existed for an investigatory stop. The record reflects that the Defendant was in an area where narcotics complaints *1097 had been made, that Officer Cerevola, an experienced police officer, believed Defendant had engaged in a hand-to-hand narcotics transaction, and that Defendant fled, unprovoked, when he saw the police.[3] Although the Defendant claims he was merely trying to "leave when two unidentified men tried to prevent him from moving," the record does not support this assertion. Officer DeSalvo explained at the suppression hearing that the Street Crimes uniform is a "military issue" uniform with a sewed-on reflector badge marked "Sheriff" at the top and in the back. The circumstances in this caseincluding Officer Cerevola's testimony that the Defendant's face "lit up" when he saw the white Crown Victoria, the fact that Defendant kept running even after Officer DeSalvo identified himself as a police officer, combined with the fact that Defendant punched Officer DeSalvo while he was wearing a Street Crimes officer's uniformindicate that Defendant knew the men were police officers. Once the Defendant punched Officer DeSalvo, reasonable suspicion for an investigatory stop ripened into probable cause to arrest the defendant for battery on a police officer, a violation of LSA-R.S. 14:34.2. Based on the foregoing, the police had reasonable suspicion to conduct an investigatory stop, which Defendant elevated, by his own actions, to an arrest. Accordingly, the trial judge was correct to deny the suppression motion.

ASSIGNMENT OF ERROR NUMBER TWO
As his second assignment of error, the Defendant argues that the trial judge erred by not removing an all white jury panel.
The Defendant contends that his right to a trial by jury chosen from a fair cross-section of his community was denied because the panel from which the petit jury was selected did not contain any African-Americans among the potential jurors. Accordingly, Defendant contends that the trial judge improperly denied his motion to strike the panel of prospective jurors. The State responds that the Defendant failed to meet his burden of showing that African-Americans were unconstitutionally excluded.
When the panel of jurors from which the Defendant's six-person jury was to be chosen arrived in the courtroom, the Defendant made a motion to strike the panel on the basis that the panel was composed entirely of Caucasians. After a brief discussion at the bench, the trial judge denied the Defendant's motion.
In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the United States Supreme Court held that the systematic exclusion of distinctive groups, in that case, women, during the jury-selection process denies a defendant his right, pursuant to the Sixth and Fourteenth Amendments, to a petit jury selected from a fair cross section of the community. In Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the Court outlined the steps for a defendant to establish a prima facie violation of the "fair-cross-section" requirement as follows:
[T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is *1098 not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[4]
Once the defendant meets his burden, the State has the burden to rebut the presumption of unconstitutionality by "establishing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Alexander v. Louisiana, 405 U.S. 625, 631-632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536.
In both Taylor v. Louisiana and Duren v. Missouri, there was evidence regarding the composition of the challenged jurors in the community, evidence concerning the ratio of the challenged groups in the community versus actual jury service, and evidence of systematic exclusion by the State. In Taylor v. Louisiana, the defendant prevailed on his claim that he was denied his right to jury trial by a "representative segment of the community" on the basis that women were systematically excluded from the jury venire. Taylor, 419 U.S. at 524, 95 S.Ct. 692. Under the system in effect at the time of Taylor's trial, a woman could not serve on a jury unless she filed with the clerk of court a "written declaration of her desire" for jury service.[5] Thus, although women comprised 53 percent of the citizens eligible for jury service in the parishes comprising the judicial district, no more than 10 percent of the jury wheel in one of the parishes were women. Further, women made up less than 1 percent (12) of the 1,800 persons drawn to fill petit juries during the year Taylor's jury was chosen. And, the evidence showed that there were no women among the 175 persons comprising the venire in Taylor's case. Id. Likewise, in Duren v. Missouri, the evidence showed that the challenged group, women, made up 54 percent of the adults in the community, but formed only approximately 15 percent of the weekly jury venires in several of the months preceding defendant's trial. Duren v. Missouri, 439 U.S. at 362-363, 99 S.Ct. 664. Defendant's all-male jury of 12 persons was chosen from a 53-person panel, only five of whom were women. Duren recognized that this underrepresentation was due to a state law that allowed women to be exempt from jury service upon request, and held this systematic exclusion of women from the jury-selection process was unconstitutional. 439 U.S. at 367-368, 99 S.Ct. 664. See also Rideau v. Whitley, 237 F.3d 472, 484 (5th Cir.2000), which held that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded.[6]
In the present case, Defendant claims that his right to trial by a jury representative of a fair cross section of the community has been denied because no African-Americans were among the panel from which his six-person jury was selected. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, (1986), the United States Supreme Court reiterated that a defendant has the right to be tried by a jury whose members are selected pursuant *1099 to non-discriminatory criteria, but does not have a right to a petit jury composed in whole or in part of persons of his own race as follows:
[T]hough the Sixth Amendment guarantees that the petit jury will be selected from a pool of names representing a cross section of the community, Taylor v. Louisiana, 419 U.S. 522[, 95 S.Ct. 692, 42 L.Ed.2d 690] (1975), we have never held that the Sixth Amendment requires that "petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population," id., at 538[, 95 S.Ct. 692]. Indeed, it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogeneous nature of our society.
Batson, 476 U.S. at 86, n. 5, 106 S.Ct. 1712.
Although it is undisputed that African-Americans are a distinctive group in the community, Defendant has not met his burden of establishing the other two prongs of the test. Defendant has offered no evidence of the second prong, which would be to establish that the representation of African-Americans in venires from which juries are selected in Jefferson Parish is not fair and reasonable in relation to the number of such persons in the community. Nor has he offered any evidence of the third prong of his burden, which would be to show that African-Americans have been systematically excluded from the jury-selection process in Jefferson Parish.[7] Because the Defendant failed to meet his burden in this case, the trial judge properly denied the Defendant's motion to strike the jury panel.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
As his third assignment of error, the Defendant argues that the trial judge erred in allowing the "rock" into evidence when the foundation was improper.
The Defendant argues that the State failed to establish a proper chain of custody of the cocaine recovered by Officer Cerevola. The State responds that it met its burden of establishing that the cocaine recovered by Officer Cerevola was the same cocaine introduced at trial.
Before evidence can be admitted at trial, it must be identified. State v. Sweeney, 443 So.2d 522, 528 (La.1983); State v. Kelson, 94-263 (La.App. 5 Cir. 11/16/94), 646 So.2d 1049, 1051. The identification may be visual, that is, testimony that the object introduced is one connected with the case, or the identification can also be accomplished through chain of custody, by tracing the object from the time it was seized to the time it was offered into evidence. State v. Sweeney, supra; State v. Kelson, supra. The evidence as to custody does not have to eliminate all possibilities that the object has been altered. State v. Sweeney, supra. Rather, for an object to be admitted into evidence, it is sufficient that the evidence shows that it is more probable than not that the object is the one connected with the case. State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376, 388, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000); State v. Kelson, supra.
In the present case, the Defendant objected to the admission of the cocaine (State's Exhibit 1) on the basis that no evidence linked it to him, and the trial judge overruled the objection. However, *1100 the record reflects that there was evidence that linked the cocaine to the Defendant. The record reflects that the item number on the police report in this case was C-14325, which was the same item number on the bag in which the cocaine was contained.[8] At trial, Officer Cerevola testified that the object Defendant spit out of his mouth was the consistency of "cookie dough." The officer explained that crack cocaine does not dissolve with moisture, but in fact retains a "clay form." Id. Although Officer Cerevola acknowledged that the cocaine he recovered was still moist and of a cookie dough consistency when he retrieved it, while the cocaine in State's Exhibit 1 was dry, the officer stated that State's Exhibit 1 was the same color as the object he retrieved.
As pointed out by the State's brief, Defendant makes much of the fact in his brief that the object Defendant spit out of his mouth was a moist glob, while the object submitted to Daniel Waguespack, the forensic scientist, was crumbled. However, Mr. Waguespack explained that the rocks of crack cocaine are frequently "crushed" by the time the evidence is submitted to the laboratory for testing.
In the present case, the cocaine in Exhibit 1 was linked to the Defendant by a preponderance of the evidence through the testimony of Officer Cerevola and the matching item numbers on the police report and the bag containing the cocaine. Thus, a proper foundation was laid for the admission of the cocaine into evidence. Any weaknesses in its identification were questions of fact for the jury to determine, which the jury resolved in favor of the State. See State v. Battie, 98-1296 (La. App. 5 Cir. 5/19/99), 735 So.2d 844, 851.
This assignment is also without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
As his final assignment of error, the Defendant argues that the trial judge erred by accepting inadequate proof before sentencing Mr. Brooks to life in prison as a third felony offender.
The Defendant contends that the State failed to prove that he was a third felony offender because the State failed to introduce the transcripts of the former plea colloquies, because the arrest registers were inadmissible hearsay, and because he was not advised that his predicate guilty pleas could be used to enhance future convictions. The State responds that the Defendant was properly found to be a third felony offender
Before reaching the specific allegations of error regarding these above allegations, however, we must address a preliminary matter regarding the sufficiency of the evidence at the multiple offender hearing. We note that more than ten years has elapsed between Defendant's conviction on the first predicate felony and the commission of the subsequent predicate offense. Further, the record contains no evidence of the actual discharge date of Defendant's first predicate felony. Both of these facts are crucial factors in a determination of whether Defendant may be found to be a multiple offender.[9]
The record discloses the following regarding this issue. The multiple offender *1101 bill of information alleged Defendant to be a fourth felony offender based on three predicate convictions: (1) armed robbery (LSA-R.S. 14:64(A)) in 1977; (2) illegal carrying of a weapon by a felon (LSA-R.S. 14:95.1) in 1986; and (3) simple robbery (LSA-R.S. 14:65) in 1994. At the multiple offender hearing, the State introduced evidence of all three predicate offenses, and Captain Merrill Boling, a fingerprints expert, linked the fingerprints of those convictions to the ones taken of Defendant in court that day.
Once the evidence was submitted, the State and defense presented argument to the trial court. As part of the State's argument, the assistant district attorney told the court that the "State cannot proceed with attempting to have the Defendant be adjudicated a fourth felony offender because we can't present to the Court the predicate as well as the 95.1 conviction," which was included "merely for purposes and out of the abundance of caution to show that this was, in fact, one and the same person." The assistant district attorney stated the State was not "withdrawing" the LSA-R.S. 14:95.1 predicate conviction from the multiple offender bill of information, but was "just making a note for the record that the State is in no way attempting to put before this Court some type of a ruse."
In addition, at the conclusion of the State's case, defense counsel entered the following objection, "the State has the burden of proving that the cleansing period has not run. The State has offered no evidence to that issue...."
Thereafter, the trial judge ruled that the felon in possession of a firearm conviction was already enhanced by statute, and therefore could not be used for purposes of additional enhancement. The Defendant's objections notwithstanding, Court then found him to be a third felony offender based on the predicates of armed robbery (1977) and simple robbery (1994).
LSA-R.S. 15:529.1 C provides as follows:
This Section shall not be applicable in cases where more than ten years have elapsed since the expiration of the maximum sentence or sentences of the previous conviction or convictions, or adjudication or adjudications of delinquency, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided herein, any period of servitude by a person in a penal institution, within or without the state, shall not be included in the computation of any of said ten-year periods (emphasis supplied).
An enhanced sentence is unavailable in a case in which a defendant has reached the expiration of the "cleansing period." Therefore, evidence that a defendant is still subject to the adverse effects of a non-expired cleansing period is plainly part of the state's burden of proof in the multiple offender trial. And, as noted above, Defendant did object during the multiple offender hearing that the State's evidence is deficient on this element of proof. We agree that Defendant's multiple offender conviction is infirm for this reason.
If less than the cleansing period has elapsed between a defendant's conviction on a predicate felony and his commission of a subsequent predicate felony, the state need not prove the date of discharge on the earlier sentence in the habitual offender proceedings. State ex rel. Clark v. Marullo, 352 So.2d 223, 230 (La.1977); State v. Humphrey, 694 So.2d at 1088. Otherwise, evidence of the actual date of discharge from supervision by the Department of Corrections is required. This is so because the discharge can take place earlier than the theoretical date on which the sentence would have terminated due to *1102 pardon, commutation or good time credit, or it could take place later because of parole revocation. See State v. Humphrey, cited immediately above.
The exhibits and testimony introduced by the State at the multiple offender proceeding establish that more than the ten-year cleansing period elapsed between the two predicates relied on by the trial judge to find the Defendant a third felony offender. The first predicate conviction, armed robbery, occurred in 1977, more than ten years before the commission of the simple robbery in 1994 (State's Exhibits 2 and 4). Because more than the ten-year cleansing period had elapsed, it was incumbent on the State to prove Defendant's actual discharge date for the armed robbery in order to establish that ten years did not pass between that date and the date of the commission of the simple robbery in 1994. State v. Humphrey, 694 So.2d at 1082. There is nothing in the record to show the date the Defendant was actually discharged from state supervision on the first offense. Therefore, the State has failed to meet its burden of proving that the cleansing period did not lapse between the armed robbery conviction and the commission of the simple robbery in 1994.
Turning now to the other objections to the use of the predicate guilty pleas, the Defendant first complains that the State failed to prove his prior guilty pleas were knowingly and intelligently made because the State did not introduce contemporaneous transcripts of the guilty pleas. Defendant did file a response to the multiple offender bill of information in which he objected to the multiple bill because he had not been advised that the guilty pleas could be used for future enhancement and because the arrest documentation is inadmissible hearsay. At the hearing, Defendant complained that the State failed to introduce evidence he was advised of his rights before entering the guilty pleas.
The record reflects that the predicates relied upon by the trial judge, armed robbery and simple robbery, were the result of guilty pleas. When a prior conviction resulted from a guilty plea, and the defendant denies the allegations in the multiple offender bill of information, State v. Shelton, 621 So.2d 769, 779-780 (La.1993), outlines the state's burden of proof.
According to Shelton, the state's initial burden is to (1) prove the existence of the prior guilty pleas and (2) that defendant was represented by counsel when they were taken. If the state meets this burden, the defendant has the burden of producing some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the state. This burden of proof will be met if the state introduces a "perfect" transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant in which the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers. Id.
If the state introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge must weigh the evidence submitted by each party to determine whether the state has met its burden of proving that the prior guilty plea was "informed and voluntary, and made with an articulated waiver of the three Boykin rights."[10]State v. Shelton, 621 So.2d at 780.
*1103 The documents submitted by the State in this matter establish both the existence of the guilty pleas and that the Defendant was represented by an attorney when he entered them. The State introduced certified copies of both predicate guilty pleas including waivers of rights forms that contained the three Boykin rights. The forms were signed by the Defendant, his attorney, and the trial judge. Additionally, the certified copies of the commitments in both exhibits reflect that the Defendant was advised of his Boykin rights. (State's Exhibits 2 and 4).
Once the State met its initial burden, the burden shifted to the Defendant to establish an infringement of his rights or a procedural irregularity in the taking of the plea. Defendant did not testify or present any evidence at the hearing. Because Defendant failed to present affirmative evidence of any infringement on his rights or procedural irregularities in the taking of his predicate pleas, the burden never shifted to the State to prove the constitutionality of the predicate pleas. See State v. Stokes, 99-1287 (La.App. 5 Cir. 4/13/00), 759 So.2d 980, 986, writ denied, 00-1219 (La.2/16/01), 802 So.2d 607.
Defendant next contends that his predicate guilty pleas were constitutionally infirm because he was not told that these guilty pleas could be used to enhance a future felony sentence. Both this Court and the Louisiana Supreme Court have recognized that the failure of Defendant to be advised that his guilty pleas could be used in a future multiple bill does not render his predicate pleas invalid. See State v. Guzman, 99-1528 (La.5/16/00), 769 So.2d 1158, 1164-1166; State v. Frickey, 00-294 (La.App. 5 Cir. 9/26/00), 769 So.2d 791, 799. Thus, merely because the Defendant was not advised that his guilty pleas could be used for future enhancement does not establish that the predicate guilty pleas were invalid.
Finally, the Defendant argues that trial judge improperly admitted the arrest registers as evidence of Defendant's identity because they were inadmissible hearsay. However, in State v. Stokes, cited above, this Court, in the context of an ineffective assistance of counsel claim, recognized that certified copies of arrest registers fall within the public records exception to the hearsay rule in LSA-C.E. art. 803(8).
Therefore, for the above reasons, we find that Defendant's complaints regarding use of the guilty pleas and arrest registers are without merit. However, because there was a failure of proof of the expiration of the cleansing period between the predicates and the instant offense, we must nevertheless vacate the multiple offender conviction and sentence.
In the past, when this Court has discovered that there is insufficient evidence at a multiple offender proceeding, we have vacated the multiple offender finding and sentence and remanded the case to the district court for further proceedings. See State v. Balser, 694 So.2d at 354. As pointed out by the Balser court, the principles of double jeopardy do not apply to sentence enhancement proceedings, and a defendant may be retried as a habitual offender.
We will adhere to the Balser procedure in the instant matter, and therefore will remand the case for re-trial of the multiple offender charge.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and we note that the record presents no such errors which require correction.
*1104 Therefore, for the above reasons, we affirm Defendant's conviction for possession of cocaine, but vacate the finding that Defendant is a third felony offender, and remand the matter to allow the State to re-try the multiple offender bill, cautioning the State, however, that proof that the cleansing period has not expired remains part of their burden of proof in these proceedings.
UNDERLYING CONVICTION AFFIRMED; MULTIPLE OFFENDER FINDING VACATED AND MATTER REMANDED.
NOTES
[1] Before trial, the defense stated that it would not be necessary to re-urge the motion to suppress, but that the defense still maintained its objection to the adverse ruling.
[2] The record indicates that the Defendant was charged in a separate bill of information with battery on a police officer, which was tried simultaneously by the judge. Defendant received a sentence of six months in parish prison to run concurrently with the cocaine sentence. The battery conviction and sentence is not at issue in this appeal.
[3] In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence produced at the hearing on the motion to suppress, but may also consider pertinent evidence given at the trial. State v. Gresham, 97-1158 (La.App. 5 Cir. 4/15/98), 712 So.2d 946, 951. Officer Cerevola did not testify at the suppression hearing; Officer DeSalvo testified at the suppression hearing and at trial.
[4] This rule has been codified in part by LSA-C.Cr.P. art. 419(A), which provides that a "general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race."
[5] See former La. Const., art. VII, § 41 (1921), and former LSA-C.Cr.P. art. 402, both of which were repealed in 1975.
[6] Cert. denied, motion granted by Cain v. Rideau, 533 U.S. 924, 121 S.Ct. 2539, 150 L.Ed.2d 708 (2001).
[7] See also State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 170-172, and State v. Lee, 559 So.2d 1310, 1313-1315 (La. 1990), in which the Louisiana Supreme Court held the defendants in these cases failed to meet their burden of showing that African-Americans were systematically excluded from the jury selection process.
[8] It is noted that the laboratory report containing the test results of the expert forensic scientist was introduced into evidence but the evidence index list in the appellate record indicates that the location of the report and the cocaine is "unknown." Neither the State nor the defense has raised any issue regarding the whereabouts of the report or the cocaine.
[9] According to the certified copy of the 1977 conviction, the Defendant was sentenced to ten years of imprisonment without benefits (State's exhibit 4). However, he was obviously released earlier than ten years from 1977, since he was arrested for illegal carrying of a weapon by a felon on August 6, 1985 (State's exhibit 2).
[10] Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).