900 So.2d 37 (2005)
STATE of Louisiana
v.
Theodore ARITA.
No. 04-KA-39.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 2005.
*39 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Andrea F. Long, Jackie Maloney, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and CLARENCE E. McMANUS.
CLARENCE E. McMANUS, Judge.

STATEMENT OF THE CASE
On October 4, 2001, the Jefferson Parish District Attorney filed a bill of information charging defendant, Theodore Arita, with attempted armed robbery, in violation of LSA-R.S. 14:27; 14:64. Defendant was arraigned on November 15, 2001, and pled not guilty.
Defendant was tried by a twelve-person jury on April 23 and 24, 2003 and was found guilty as charged. Defendant filed a Motion for New Trial on May 8, 2003. The trial court heard and denied the motion that day. Defendant waived statutory delays, and the court sentenced him to twenty-five years at hard labor, without benefit of parole, probation, or suspension of sentence. Defendant made an oral motion for appeal and filed a written Motion for Appeal on May 14, 2003, which the court granted on that same day.
The state filed a habitual offender bill of information, alleging defendant to be a third felony offender. On May 8, 2003, defendant entered a denial to the state's allegations. On July 24, 2003, the state amended the habitual offender bill to remove one of the alleged prior convictions. As part of a plea agreement, defendant entered an admission to second offender status. The court accepted defendant's admission, and found him to be a second felony offender. The court vacated defendant's original sentence, and imposed an enhanced sentence of thirty years at hard labor, without benefit of parole, probation, or suspension of sentence.

FACTS
Meineke Davis testified that she was employed as a manager at a McDonald's Restaurant at 301 Veterans Highway in Metairie. She testified that, on August 27, 2001, she worked the night shift at the restaurant and performed closing duties with employees Candie Robertson and Benjamin Harrison.
Davis testified that she and the other two employees got into her car in the McDonald's parking lot. Davis prepared to drive to the parking lot of a nearby Winn-Dixie Supermarket to wait for Robertson's mother to arrive. Davis said defendant *40 approached the passenger side of her car with a gun in his hand. He ordered the three to go back into the restaurant and said no one would get hurt if everyone did what they had to do. Davis, Robertson, and Harrison got out of the car and walked toward the restaurant with defendant. Defendant told Davis to return to her car to turn off the lights. Davis complied, and then they all entered the building.
Davis testified that defendant ordered her to open the safe in the manager's office. Harrison turned on the lights to allow her to see. Davis had trouble opening the safe. Defendant banged on the safe and said, "`Open up the m____ _f safe, b____, before I shoot.'" He continued to shout and curse at Davis, while clicking the gun.
Davis testified that in entering the restaurant they had set off the security alarm. The telephone began to ring, and Davis assumed the alarm company was calling. Defendant said, "`I know that's the alarm people calling. Hurry up. Hurry up. Hurry up.'" Defendant continued to point the gun at her back and to click it.
At one point defendant asked Harrison whether the restaurant's back door was unlocked. Harrison replied that it was not. Defendant then asked if there was another door unlocked. The three employees told him the front door was still unlocked.
Defendant said to Davis, "`B____, you ain't opened the safe yet? Hurry up and open the safe.'" After several attempts, Davis was able to open the safe. She turned to tell defendant, but found he was not there. She saw him walk out through the front of the restaurant. Davis testified that defendant did not take anything from her or the other employees.
Davis said she exited the restaurant with Robertson and Harrison and found Robertson's mother outside waiting. Robertson's mother used her cellular telephone to call police. Davis testified that when officers arrived at the scene, she informed them of the incident and gave them a description of the perpetrator. She identified defendant in a photographic lineup on September 7, 2001. She also identified defendant at trial as the man who attempted to rob her.
Harrison, a high school senior, testified that he and the other employees closed the restaurant at about 1:00 a.m. He sat in the front passenger seat of Davis' car, eating a McDonald's parfait and spitting the granola out of the window. At one point Harrison turned to the open window and saw defendant standing next to the car pointing a gun at his face. Harrison testified that, as Davis tried to open the restaurant's safe, defendant threatened to shoot her in the back of her head.
Harrison testified that it took officers about an hour to get to the restaurant after defendant left the scene. He spoke to sheriff's deputies when they arrived. He got a good look at the perpetrator's face and was able to give a description to officers. He identified defendant in a photographic lineup on September 6, 2001. He identified defendant at trial as the perpetrator.
Robertson testified that she was sitting in the back seat of Davis' car when defendant approached with a gun. She was terrified and cried during the incident. She testified that she spoke with officers when they arrived at the scene, and gave them a description of the perpetrator. Robertson testified that she identified defendant in a photographic lineup on September 6, 2001 and identified defendant in court.
*41 Detective Gerald Trahan of the Jefferson Parish Sheriff's Office testified that he was on patrol when he was called to report to the scene of the attempted robbery. Eight to ten other deputies also reported to the scene. Several of those deputies interviewed the victims. Trahan testified that he inspected the inside of the restaurant and found a .9 mm round on the floor near the drive-up window.
Trahan accompanied Sergeant Don Carson, a crime scene technician, as he processed the scene. He watched as Carson dusted the driver's side and passenger doors for fingerprints. Trahan testified those were the areas the witnesses saw the perpetrator touch. Carson showed Trahan that he had found a good print on the passenger door. Trahan interviewed Davis, Harrison, and Robertson, and included their descriptions in his incident report.
Detective Jeffery Rodrigue of the Robbery Squad testified that he conducted a follow-up investigation of the attempted robbery and developed defendant as a suspect. He compiled a photographic lineup and included a picture of defendant. He showed the lineup to Davis, Harrison, and Robertson individually. Each witness identified defendant as the perpetrator.
Lieutenant Patricia Adams testified that she works in the Latent Fingerprints Division of the sheriff's office. She lifts latent fingerprints at crime scenes and analyzes fingerprints. The court accepted her as an expert in lifting, analyzing, and identifying fingerprints. Adams testified that she compared the latent fingerprint from the scene with a set of defendant's fingerprints she had taken herself. She concluded that the prints on both exhibits were made by the same person. Adams testified that she had not lifted the latent print.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant argues that the trial court erred in allowing the state to introduce latent fingerprint evidence without producing Sergeant Don Carson, the crime scene technician who purportedly lifted the fingerprint from the door of Meineke Davis' car. At trial, Detective Gerald Trahan testified that he was one of several officers at the scene of the attempted robbery. He further testified that Carson was the technician who "processed" the scene. At that point defense counsel, in a sidebar discussion, objected to the production of any fingerprint evidence collected by Carson. Counsel argued that any such evidence would be hearsay unless Carson himself testified. The prosecutor explained to the court that Carson was not there to testify because he had retired from the sheriff's office, and was "driving a mobile home around the United States. He's in Montana." The prosecutor argued that the fingerprint evidence was not hearsay, as Trahan was with Carson when the latter collected the evidence and could give a firsthand account of Carson's actions.
On further questioning by the prosecutor, Trahan testified that he was with Carson as he processed the scene. Trahan testified that Carson recovered one latent fingerprint from the passenger side of Davis' vehicle. Trahan included that information in his report. On cross-examination, Trahan testified that witnesses reported the perpetrator had touched the driver's side and passenger side doors, so Carson dusted both of those doors for fingerprints. Carson was only able to get a fingerprint from the passenger door. Trahan saw Carson use dusting powder on the passenger side of the car. Trahan testified that he did not lift the fingerprint himself, nor did he deliver it to the sheriff's office. He said, "That's not my line of work." Trahan said it was Carson who *42 took possession of the fingerprint and delivered it to the sheriff's office.
Later in the proceedings, defense counsel objected to the state calling an expert in fingerprint analysis and identification. Counsel argued that Trahan's testimony did not show he was ever the custodian of the latent fingerprint and that the state, therefore, failed to establish its chain of custody. Counsel argued that no state witness had, to that point, identified the latent fingerprint as the one lifted from Davis' car. The court ordered a hearing outside the jury's presence to determine the admissibility of the fingerprint evidence.
The state first offered the testimony of Detective Rodrigue, who identified his supplemental police report as the one he prepared in this case. Rodrigue also identified the Jefferson Parish Sheriff's Office crime report, dated August 27, 2001 and identified an evidence card prepared by a crime scene technician. Finally, Rodrigue identified the latent fingerprint slide dated August 27, 2001. The detective testified that he did not lift the fingerprint, nor was he present when the print was lifted.
Virgil McKenzie testified that he has worked with the Latent Fingerprint Division of the Jefferson Parish Sheriff's Office since 1995. He testified that he routinely picks up fingerprint evidence from the Sheriff's Office Crime Scene Division, and transports it to the Latent Fingerprints Division for analysis. He uses that procedure at least ninety-five per cent of the time, and he followed that procedure in the instant case.
McKenzie identified a photocopy of the crime scene division's evidence book. He testified that an entry was made by Sergeant Don Carson, a crime scene technician. McKenzie testified that the photocopy showed the information was entered on August 27, 2001, at 109 hours. The location was listed as 301 Veterans. One fingerprint slide was listed, along with Sergeant Carson's name. McKenzie identified his signature on page two of the photocopy, showing that he checked out evidence.
McKenzie testified that, although he has had occasion to recover latent fingerprints at crime scenes, he did not lift the latent print in the instant case. Fingerprint removal is generally done by trained experts such as himself. Certain techniques must be used in order to ensure the integrity of the prints. McKenzie has been qualified in court as an expert witness in the removal and analysis of latent fingerprints.
Lieutenant Patricia Adams of the Latent Fingerprint Division testified that she received the latent fingerprint slide at the Crime Lab sealed in an envelope. The envelope bore the same case number as the latent print. Adams testified that she did not lift the print and that she does not know the circumstances under which it was lifted. She further stated that if Sergeant Carson had used the wrong chemicals or procedures in lifting the fingerprint, the latent print would not be as visible as it is.
Upon completion of the testimony, defense counsel argued that to allow the state's fingerprint evidence to be admitted without the appearance of Sergeant Carson would violate defendant's Sixth Amendment right of confrontation. Counsel further argued that, in Carson's absence, the state would be unable to prove chain of custody with regard to the fingerprint. The judge rejected defense counsel's arguments, stating, in part:
The Court finds that the chain of custody foundation has been laid during this hearing and the Court finds that it would be appropriate evidence to be heard by the jury.

*43 The Court also believes that this Defendant, Mr. Arita, has  and will have an opportunity to confront his accusers as is contemplated by our Constitution.
The jury returned to the courtroom, and the state was allowed to proceed with its case.
The court accepted Lieutenant Adams as an expert in the lifting, analysis, and identification of fingerprints, and the officer testified before the jury. Adams stated that the most common way of lifting fingerprints is dusting a surface with powder, making latent prints visible. Tape is then used to lift the print and put it on a backing. If a surface is wet, a wet re-agent solvent is applied to the surface instead of powder. The solvent brings up the latent print. An after wash is then used to get the loose chemicals away from the latent print, and the print is lifted with tape.
Adams testified that she did not lift the fingerprint in this case, but she did make a comparison between the latent print and defendant's fingerprints. She identified the fingerprint card on which she took defendant's prints. She also identified the latent print. She stated that she first saw the latent print when it was brought into her office. Upon comparing the latent print with those prints taken from the defendant, Adams concluded they were made by the same person.
Defendant now renews his claims that the state failed to lay the proper foundation for admission of the latent fingerprint and that he was deprived of his right of confrontation because he was not allowed to cross-examine Sergeant Carson. Before it can be admitted at trial, demonstrative evidence must be properly identified. LSA-C.E. art. 901. A sufficient foundation for the admission of evidence is established when the evidence as a whole shows it is more probable than not that the object is one connected with the crime charged. The identification can be visual, through testimony. The identification can also be accomplished through chain of custody, by tracing the object from the time it was seized to the time it was offered in evidence. State v. Cosey, 97-2020, p. 3 (La.11/28/00), 779 So.2d 675, 678, cert. denied, 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001); State v. Brooks, 01-864, p. 9 (La.App. 5 Cir. 1/29/02), 807 So.2d 1090, 1099.
The evidence as to custody need not eliminate all possibilities that an object has been altered. It is sufficient if the evidence shows it is more likely than not that the object is one connected with the case. State v. Brooks, supra. Once a proper foundation has been laid with regard to a piece of evidence, a lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than the admissibility. Ultimately, a chain of custody is a factual matter for determination by the jury. State v. Addison, 03-1421, p. 25 (La.App. 5 Cir. 3/30/04), 871 So.2d 536, 551, writ denied, 04-1291 (La.10/29/04), 885 So.2d 584.
The state was able to establish the whereabouts of the latent fingerprint for almost the entire period between when it was lifted from the car until it was produced in court. Detective Trahan described in detail how Sergeant Carson lifted the print. Virgil McKenzie testified that he picked up the fingerprint at the crime scene division, where the division's evidence log showed Carson had deposited it on the morning of the offense. Patricia Adams testified that she received the fingerprint and examined it. Carson's absence at trial meant that there was no testimony regarding the transport of the fingerprint from the scene to the crime lab. Despite that gap, it appears the state *44 proved, by a preponderance of the evidence, that the latent print was connected with the case.
Defendant argues that the latent fingerprint was inadmissible hearsay. On the contrary, the fingerprint was admissible under the exception to the hearsay rule codified in LSA-C.E. art. 803. The article provides, in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(8) Public records and reports. (a) Records, reports, statements, or data compilations, in any form, of a public office or agency setting forth:
(i) Its regularly conducted and regularly recorded activities;
(ii) Matters observed pursuant to duty imposed by law and as to which there was a duty to report;
. . . .
(b) Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
(i) Investigative reports by police and other law enforcement personnel.
(ii) Investigative reports prepared by or for any government, public office, or public agency when offered by that or any other government, public office, or public agency in a case in which it is a party.
(iii) Factual findings offered by the prosecution in a criminal case.
(iv) Factual findings resulting from investigation of a particular complaint, case, or incident, including an investigation into the facts and circumstances on which the present proceeding is based or an investigation into a similar occurrence or occurrences.
The Jefferson Parish Sheriff's Office has a duty to seek out and obtain fingerprint evidence as part of its criminal investigations. Also, latent fingerprints are obtained and recorded as part of the department's regularly conducted and recorded activities. Thus, the latent fingerprint is covered by LSA-C.E. art. 803(8)(a)(i) and 803(8)(a)(ii). The print does not fall under any of the four exclusions to the public records exception listed under Article 803(8)(b).
No Louisiana cases directly address the issue of whether a latent fingerprint falls under the public records exception to hearsay. But the Second Circuit found, in State v. Lee, 577 So.2d 1193 (La.App. 2 Cir.1991), that the defendant's inked fingerprints, taken by police when he was arrested and booked, were admissible under LSA-C.E. arts 803(8)(a)(i) and 803(8)(a)(ii). The court reasoned that police have a duty, under LSA-R.S. 15:590-592, to collect the fingerprints of persons arrested for felonies, and to submit them to the Louisiana Bureau of Criminal Identification.
The Lee court cited as authority State v. Nicholas, 359 So.2d 965 (La.1978) and State v. Woodard, 387 So.2d 1066 (La. 1980), cases pre-dating the Louisiana Code of Evidence, in which the Louisiana Supreme Court held that fingerprints on file with a police agency fall under the public documents exception to the hearsay rule. The Lee court also noted that the United States Fifth Circuit, in United States v. Dancy, 861 F.2d 77 (5th Circuit 1988), held that fingerprints on file with a police agency fall under the public documents exception pursuant to Rule 803(8) of the Federal Rules of Evidence. Lee, 577 So.2d at 1196.
Defendant argues that the instant case is distinguishable from Lee and Woodard, because booking fingerprints are taken by police in the normal course of business, but *45 latent fingerprints are not. We find that defendant's argument has no merit. He appears to confuse the public records exception with the hearsay exception for business records, LSA-C.E. art. 803(6). A latent fingerprint is taken and maintained as part of the public duties of the sheriff's office, as is a booking fingerprint.
Defendant lastly complains that the admission of the latent fingerprint when Sergeant Carson was not available for cross-examination deprived him of his constitutional right of confrontation. The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Jackson, 03-883, p. 17 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852, writ denied, 04-1399 (La.11/8/04), 885 So.2d 1118.
Traditionally, for purposes of the Confrontation Clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). But the United States Supreme Court recently overruled Roberts insofar as it applies to out-of-court statements that are "testimonial" in nature. See, Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 1369-1374, 158 L.Ed.2d 177 (2004). The Crawford Court held that the "adequate indicia of reliability" standard set forth in Roberts is too amorphous to adequately prevent the admission of "core testimonial statements that the Confrontation Clause plainly meant to exclude." Crawford, supra. The Court held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. Id.
The Crawford Court drew a distinction between testimonial and non-testimonial hearsay and noted that non-testimonial hearsay is admissible where both prongs of Roberts are satisfied, regardless of whether the defendant has had a prior opportunity to cross-examine the declarant. Id. The Court declined to provide a comprehensive definition of "testimonial," although it did state that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id.
The evidence at issue here, i.e., the fingerprint, was clearly non-testimonial hearsay evidence. Therefore, the two-prong test of Roberts must be applied to determine its admissibility under the Confrontation Clause. If Sergeant Carson is considered the "declarant," the state was required to show he was unavailable to appear at trial. LSA-C.E. art. 804(A) provides, in part: "Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court."
The Roberts Court held that "The basic litmus of Sixth Amendment unavailability is established: `[A] witness is not "unavailable" for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial.'" Roberts, 448 U.S. at 74, 100 S.Ct. at 2543 (quoting Barber v. Page, 390 U.S. 719, 724-725, 88 S.Ct. 1318, 1321-1322, 20 *46 L.Ed.2d 255 (1968) (emphasis added)). See also, State v. Robinson, 423 So.2d 1053, 1058-1059 (La.1982). Where the issue of unavailability is concerned, this Court has held that "[t]he lengths to which the State must go to try to produce a witness is a question of reasonableness." State v. Williams, 02-645, p. 13 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 505, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
In the instant case, the prosecutor informed the trial court that Carson was not there to testify because he had retired from the sheriff's office, and was "driving a mobile home around the United States. He's in Montana." She did not reveal what action, if any, the state had taken to try to have Carson there for trial, nor did the state offer any specifics regarding Carson's whereabouts. During her direct examination of Detective Trahan, the prosecutor asked him whether he knew where Carson was at that time. Trahan responded, "No, ma'am. I know he retired from the Sheriff's Office."
It is arguable that the state failed to show that it made a sufficient effort to locate Carson and procure his presence at trial. If that was the case, then the state failed to satisfy the first prong of the Roberts test for admissibility of hearsay. But even if the trial court erred in admitting the fingerprint evidence, confrontation errors are subject to a Chapman v. California[1] harmless error analysis. See, Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); State v. Hawkins, 96-0766, p. 5 (La.1/14/97), 688 So.2d 473, 478; State v. Royal, 03-439, p. 10 (La.App. 5 Cir. 9/30/03), 857 So.2d 1167, 1173, writ denied, 03-3172 (La.3/19/04), 869 So.2d 849.
The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
Delaware v. Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438.
In the instant case, we find that any error in admission of the latent fingerprint was rendered harmless by the overwhelming amount of identification evidence presented by the state. All three of the witnesses to the incident described the perpetrator in detail. There were no significant discrepancies among their descriptions. They all identified defendant in court as the perpetrator, and they all identified defendant in a photographic lineup. We further note that defense counsel cross-examined the state's witnesses extensively and effectively regarding the latent fingerprint and other identification issues.
Based on the foregoing, we find that defendant was not deprived of his right of confrontation by the state's failure to produce Sergeant Carson at trial. Therefore, we find that the trial court did not err by allowing the introduction of the latent fingerprint evidence.

*47 ERRORS PATENT DISCUSSION

The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). We find there are no errors that require corrective action.
We do note that defendant's Motion for Appeal was premature, because it was filed after his conviction and original sentencing, but before the court's habitual offender finding. The procedural defect was cured, however, by the court's imposition of the habitual offender sentence. State v. Bagemehl, 98-1134, p. 3 (La.App. 5 Cir. 5/19/99), 737 So.2d 228, 229, fn. 1. Therefore, no corrective action is required.
In accordance with the above, we affirm the defendant's conviction and sentence.
AFFIRMED.
DALEY, J., concurs with results, but not reasons.
NOTES
[1] Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).