910 So.2d 977 (2005)
STATE of Louisiana
v.
Van LEONARD.
No. 05-KA-42.
Court of Appeal of Louisiana, Fifth Circuit.
July 26, 2005.
*979 John M. Crum, Jr., District Attorney, Fortieth Judicial District, Parish of St. John the Baptist, Rodney A. Brignac, Assistant District Attorney, Edgard, Louisiana, for Plaintiff/Appellee.
Edwin D. Hawkins, New Orleans, Louisiana, for Defendant/Appellant.
*980 Panel composed of Judges EDWARD A. DUFRESNE, JR., SUSAN M. CHEHARDY, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On August 21, 2002, defendant, Van Leonard, was indicted by a grand jury in St. John the Baptist Parish for the first degree murder of Curtis Bibbins in violation of LSA-R.S. 14:30(A)(1) and (4) by having the specific intent to kill or to inflict great bodily harm while in the perpetration or the attempted perpetration of armed robbery and/or in the alternative by being engaged in the perpetration or attempted perpetration of the distribution, exchange, sale or purchase of a controlled dangerous substance. On September 3, 2002, the grand jury returned an amended indictment, still charging defendant with first degree murder, but containing typographical corrections. Defendant pled not guilty at arraignment on September 18, 2002. The indictment was later amended to change the number 4 to the number 6 regarding the subsection of LSA-R.S. 14:30(A) under which the State proceeded. Defendant pled not guilty when re-arraigned.
On August 25, 2003, the prosecution stated that it would not seek the death penalty. On June 21, 2004, defendant went to trial before a jury of twelve persons, which unanimously found him guilty as charged. After denying defendant's motion for new trial, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. This timely appeal follows.

FACTS
On Saturday, March 23, 2002, fishermen discovered the body of twenty-year-old Curtis Bibbins floating in the water under the I-55 northbound overpass near mile marker 10.9. At approximately 10:30 a.m., officers from the St. John the Baptist Parish Sheriff's Office responded to scene. Sergeant Michael Davis discovered what appeared to be blood stains in the emergency lane and on the side and top of the guardrail above the victim's body.
The body was removed from the water and brought to shore near the Ruddock Exit. At 12:30 p.m., the body was examined by a physician from the St. John's Parish Coroner's office. Based on the victim's stomach contents and the condition of his body, Dr. Christy Montegut, the St. John's Parish Coroner, testified that the victim was shot sometime before midnight on March 23, 2002. However, Dr. Montegut could not pinpoint the actual time the gunshot wound was inflicted. In addition, the projectile was recovered during the autopsy.
Because the victim resided in New Orleans, the New Orleans Police Department assisted Detective St. Martin in contacting the victim's family. Crystal Keeler, the victim's girlfriend, testified that the victim sold marijuana. Ms. Keeler also testified that she last saw the victim at his residence at approximately 7:00 p.m. on Friday, March 22, 2002. The victim told her that he was going to Memphis to buy marijuana and that "Van" was going with him. The victim said that they were going in Van's van. The van contained crates, which they were going to use to transport the drugs. Ms. Keeler saw a shoe box and a box of Saran Wrap on the floor in the victim's residence. Ms. Keeler said the shoe box contained bundles of money and each bundle was held together with a black rubber band in the center of the bundle. The victim told her that the money was packaged in $1,000 increments. Ms. Keeler admitted that she recalled telling Detective St. Martin that the victim told her that the marijuana was going to sell at $400 per *981 pound for a total of $40,000. She did not recall telling Detective St. Martin that the defendant had a supplier for the marijuana. Ms. Keeler said that the victim's car was at his residence and that there was no van at the victim's residence when she was there. Detective St. Martin testified that he learned from Crystal Keeler that the victim was going to the residence of a friend, Rene Shields. Detective St. Martin spoke to Shields, who confirmed that the victim was at Shields' residence at approximately 7:30 p.m.
At 8:45 p.m., the victim telephoned Ms. Keeler from his cell phone. He said that he was in Laplace and that he would call her "tomorrow or whenever." The victim did not mention whether or not he was with Van at the time. In addition, Ms. Keeler testified she had never met Van and that she did not recognize the defendant.
After obtaining statements from the victim's mother and girlfriend, Detective St. Martin contacted Jefferson Parish Sheriff's Detective Clogher to obtain a search warrant for defendant's residence, which was located at 2168 South Glenn Cove in Jefferson Parish. On the evening of March 28, 2002, Detective Clogher executed the warrant in the presence of several St. John Parish officers.[1] The officers discovered a silver box in the master bedroom closet containing $22,850 in cash in bundles. Two of the bundles were packaged in Saran Wrap and each bundle totaled $10,000. Each $1,000 increment within these two bundles was held together with a black rubber band in the center of the bundle. The remainder of the money was in two bundles that were held together with a black rubber band in the center of the bundle. In addition, the police found $2449 in several bundles of cash held together with a black rubber band in the center inside of the defendant's wife's purse. Two of these bundles were also in $1,000 increments. They found $208 in cash in defendant's wallet. The police also found a live nine millimeter round in a dresser drawer of the master bedroom. In addition, the police found a title to a grey Ford van registered to 2DXtreme Transport.
Later that evening, defendant made a statement, which was not recorded, to Detective St. Martin at the Jefferson Parish Detective Bureau. According to Detective St. Martin, defendant said that he dropped the victim off at the victim's residence between 7:00 and 7:30 p.m. before returning home. Defendant denied that he was involved in the victim's death, but he said that he would be willing to die for the crime. Further, defendant said a few times that he was too deep into something, but would not elaborate. However, defendant said that Detective St. Martin could not offer him or his family any kind of protection. Defendant also told Detective St. Martin that he was an independent contractor delivering pharmaceuticals for another company in his company van. Defendant related that the van was stored in the company's warehouse in Kenner. Defendant provided the keys to the van and gave the officers permission to search it. When asked how much money was at his house, defendant replied that there was about $200. In addition, defendant said that he was the only person who drove the van. Detective St. Martin and other officers went to the warehouse in the early morning hours of March 29, 2002 and met with Brian Hymel, the terminal manager for Consolidated Delivery and Logistics (CD & L). Mr. Hymel told police that defendant was an independent contractor *982 who delivered pharmaceutical products to drug stores and hospitals for CD & L. Mr. Hymel also said that the van was customarily parked in the warehouse. The officers looked around the outside of the van to see if there was any evidence in plain view. When they saw what appeared to be blood on the sliding door of the van, they had the van towed and secured until a search warrant could be obtained. On April 2, 2002, the search warrant was executed. They found a spent nine millimeter casing under the driver's side seat. The officers seized the entire passenger's side seat because there appeared to be blood under the seat, seized portions of the rubber stripping from the door frame, and a pair of rubber gloves. Detective St. Martin testified that he found blood in 16 different locations inside the van and that most of the blood was on the sliding door of the van.
The victim was linked to defendant's van through DNA testing. Because the autopsy samples were insufficient to obtain the victim's DNA, samples were collected from the victim's mother. DNA expert Julie Golden testified that she tested 15 unknown samples from the crime scene. Of that number, there were no interpretable results on 9 of the samples. Six of the results were all from the same male individual and were consistent with being a child of Ms. Bibbins. DNA that was consistent with being from biological child of Ms. Bibbins was found on the rubber stripping of the front passenger's side door, on the cloth of the front passenger's seat and on the gloves from the vehicle. Samples from the rubber stripping from the van's front passenger door and two other blood samples from the van produced a complete DNA profile. Ms. Golden testified that it was 250 times more likely that these DNA samples were from a child of Ms. Bibbins than of a random individual. The blood sample from the road, the black vinyl gloves, and cloth from the front passenger's seat all produced a partial profile, which were still consistent with being from a biological child of Ms. Bibbins, but the statistics were not as strong. According to Ms. Bibbins, she only had one other child. Ms. Bibbins testified that neither she or that child had been in an accident on I-55 and that neither of them had ever been inside defendant's van.
According to Patrick Lane, the State's firearms expert, the nine millimeter spent casing from the van and the nine millimeter live round from defendant's residence had both been cycled through the same magazine at some point in time. However, he could not link the projectile recovered from the victim to the live round or to the spent casing found in the van. Mr. Lane testified that the projectile recovered from the victim was composed of fragments. Mr. Lane acknowledged there was another test, which he could not perform at his facility, that could possibly reveal a link between a projectile and a casing. But, Mr. Lane did not believe that it was feasible to perform this test on the projectile recovered from the victim due to its condition.
Defendant did not testify at trial, but presented an alibi defense through his son, Travis Leonard, who was a United States Marine, and his friend, Darryl Washington. According to Washington, defendant called him at 11:30 a.m. on March 22, 2002 and asked him to meet him at the Winn-Dixie on Louisiana and Claiborne. When defendant entered Washington's vehicle, Washington saw the defendant's van depart from the parking lot. Defendant told Washington that "Baldy" said to tell him hello. Although defendant never affirmatively said so, Washington assumed from these events that defendant had loaned his van to Baldy. Washington brought defendant home, but he saw defendant again *983 later that evening between 6:30 and 6:45 p.m. when defendant came to his residence on Ames Boulevard. Shortly thereafter, they went to eat at Popeye's and played a videogame, John Madden 2004, until 9:00 or 9:15 p.m. According to Washington, they have a videogame tournament at his house with a lot of people every Friday night, but on this particular evening, the game ended early because defendant needed to take Travis somewhere early the following morning. Washington said that Travis and another friend were also at the house.[2] Defendant came over on Sunday morning to play the videogame again. However, he received a phone call from Baldy. After the call was over, defendant asked Washington to bring him to pick up the van at Winn-Dixie. Thereafter, Washington drove defendant's truck and defendant drove the van to the warehouse where he stored the van. Washington said that defendant and another person, Calvin Fletcher, had started the transportation company and that Fletcher also drove the van. Washington said he had driven the van before and that defendant frequently loaned out the van. Travis said that he and his father went to Washington's house between 5:30 and 6:00 p.m. to play John Madden 2004 and that they left between 9:00 and 9:15 p.m. According to Travis, his father was at home at 11:00 p.m. when he went to sleep and he was there when Travis woke up at 6:00 a.m. the next morning.
Neither Washington nor Travis immediately disclosed this alibi information. Washington testified that he told defendant's attorney's assistant approximately one year and a half before the trial and Travis testified that he related this information to his father's attorney three to four months before trial.

ASSIGNMENT OF ERROR NUMBER ONE
The evidence adduced at trial is insufficient to support the verdict of guilty. As such, the conviction violates the dictates of Jackson v. Virginia, and must be reversed.

DISCUSSION
Defendant contends the evidence is insufficient to support his first degree murder conviction because the State did not prove beyond a reasonable doubt that he was the perpetrator of the offense.
The constitutional standard for evaluating the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the State proved all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When circumstantial evidence is introduced to prove the commission of a crime, LSA-R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; rather, all evidence, both direct and circumstantial, must be sufficient under the Jackson standard to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
The circumstances of LSA-R.S. 14:30(A) recited in defendant's first degree murder indictment are as follows:

*984 A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery ...
. . . .
(6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance listed in Schedules I, II, III, IV, or V of the Uniform Controlled Dangerous Substances Law.
Defendant does not challenge his conviction on the basis that any of the statutory elements were lacking. Rather, defendant contends the State failed to prove he was the perpetrator. Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Zeno, 99-69 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 706, writ denied, 00-0105 (La.6/30/00), 765 So.2d 1065. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.
Like pieces of a puzzle, the State presented evidence that fit together, to present a complete picture that proved defendant was the perpetrator beyond a reasonable doubt. One of these pieces was Crystal Keeler's testimony, which placed the victim and the defendant traveling together in defendant's vehicle to Memphis. Also, Ms. Keeler's testimony establishes an inference that there was a connection between the money Ms. Keeler saw at the victim's residence and the money that was found at defendant's residence. Specifically, Ms. Keeler saw Saran Wrap on the floor at the victim's residence; $20,000 of the money in defendant's closet was in two separate bundles wrapped in Saran Wrap. The victim told Ms. Keeler that the money in the shoe box was in $1,000 increments and that the marijuana would sell for $40,000; most of the cash found in defendant's closet and in his wife's purse was bundled in $1,000 increments. In addition, when shown the photograph of the money in the box, Ms. Keeler acknowledged that the money wrapped in black rubber bands looked similar to the money she saw in rubber bands at the victim's residence.
Physical evidence connected defendant's van and the victim. The police found numerous areas that appeared to be blood in the van, mostly on the passenger's side door and seat. DNA testing linked the victim to the van, the gloves in the van and to the road above the location where his body was discovered. Ballistics testing linked the spent casing in the van to the live round found in the defendant's house.
In addition, defendant's statement was inconsistent with Washington's testimony. Specifically, Detective St. Martin testified that defendant told him that he was the sole user of the van. According to Detective St. Martin, defendant never mentioned that he was at Washington's house or anything about Travis. The detective also testified that no one had ever suggested to him that there was another person driving the van on March 22, 2002, and that he had no evidence that any person other than defendant was driving the van that day. Moreover, Detective St. Martin testified that the investigation developed no other suspects, including Baldy.
In returning the verdict of guilty as charged, the jury apparently rejected the alibi defense and obviously did not believe that defendant had loaned his van to "Baldy" *985 when the murder occurred. It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); Accord, State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297. Viewing the evidence in this case in the light most favorable to the prosecution, a rational jury could have found the State proved beyond a reasonable doubt that defendant was the perpetrator.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
Over the defendant's objections, Crystal Keeler, the victim's alleged girlfriend, was permitted to give hearsay testimony which did not fall within any of the exceptions to the hearsay rule, which testimony was prejudicial to the defendant, and which constituted other crimes evidence and denied him of his constitutional right to a fair trial.

DISCUSSION
Defendant contends that the trial court erred in permitting Crystal Keeler to testify that the victim told her on the evening of his death that he was going to Memphis with defendant to purchase 100 pounds of marijuana with $40,000. According to defendant, the victim's statement was inadmissible hearsay, and it was not harmless error to admit the statement because the victim was not subject to cross-examination. Defendant also complains that the statement constituted inadmissible evidence of other crimes.
The record reflects that on April 20, 2004, the State provided the tape-recorded statements of Ms. Keeler to defendant. On June 16, 2004, a few days before trial, defendant filed a motion in limine to exclude Crystal Keeler's statements the police.[3] On June 22, 2004, the trial judge deferred the motion until Ms. Keeler took the stand. Prior to her testifying, the court held a hearing in which defendant moved to exclude Ms. Keeler's anticipated testimony that the victim told her he was traveling to Memphis with defendant to buy 100 pounds of marijuana. Defendant argued that the victim's statement was inadmissible hearsay and would violate his right to confront the victim under Crawford v. Washington.[4] After argument by the State and the defense, the trial judge ruled that Crawford was inapplicable and that the victim's statement was admissible as a statement in furtherance of a conspiracy, as a statement against interest, and as res gestae. At trial, defendant lodged several hearsay objections during Ms. Keeler's testimony, which the trial court overruled.
Initially, it is noted that defendant in brief argues that the statement was evidence of other crimes committed by defendant and for this reason he was entitled to notice under State v. Prieur, 277 So.2d 126 (La.1973). However, defendant *986 failed to base his objection on this ground at the time he made the objection at trial. In State v. Spell, 399 So.2d 551, 555 (La. 1981), the supreme court rejected a similar argument by the defendant and held that defendant was precluded from asserting it for the first time on appeal. See also, State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 77, writ denied, 98-264 (La.6/19/98), 719 So.2d 481, where this Court limited its analysis to the defendant's trial objection, not the new objection urged for the first time on appeal. Accordingly, this opinion does not address the issue because defendant did not object during trial to the statement as inadmissible other crimes evidence.[5]
Turning to defendant's assigned error, hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. LSA-C.E. art. 801(C). Hearsay evidence is not admissible except as otherwise specified in the Louisiana Code of Evidence or other legislation. LSA-C.E. art. 802.
The trial court ruled that the statement was admissible as a co-conspirator's statement. LSA-C.E. art. 801(D) enumerates those statements which are considered non-hearsay and includes statements offered against a party made by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided a prima facie case of conspiracy is established. LSA-C.E. art. 801(D)(3)(b). In State v. Lobato, 603 So.2d 739, 747 (La.1992), the Louisiana Supreme Court explained that a prima facie case of conspiracy is established when the State introduces evidence which, if unrebutted, would be sufficient to establish the facts of the conspiracy. Id. Statements made by co-conspirators which are the object of a defendant's hearsay objection may be considered by the trial court in making its determination as to whether the State established a prima facie case of conspiracy. Id.
Even assuming that a prima facia case of conspiracy was established in the instant case, we fail to find that the victim's statement falls within this exception because it is difficult to envision how the statement to Ms. Keeler furthered the conspiracy. Instead, we find that the victim was simply relating his future whereabouts to his girlfriend. Thus, we conclude that the co-conspirator exception does not apply to this case.
The trial court also ruled that the statement was admissible as a statement against interest. When the declarant is unavailable, LSA-C.E. art. 804(B)(3) provides a hearsay exception for a statement that, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true.
In State v. Hammons, 597 So.2d 990 (La.1992), the Louisiana Supreme Court explained as follows:
When the statement is one against the declarant's penal interest, the circumstances surrounding the making of the *987 statement may be significant in determining its trustworthiness. If a declarant admits sole responsibility for a serious crime, the statement is generally prima facie against interest so as to satisfy this requirement of the rule . . . However, if the statement is clearly self-serving, as when the declarant is seeking favorable treatment for himself in return for cooperation, the statement may be deemed not against his interest and thus may fall outside the exception. . . Likewise, when the declarant unknowingly speaks to informants or undercover agents, the statement is usually admissible under the exception . . .
Id. at 996, citations omitted, emphasis added.
In this case, the declarant, the victim was clearly unavailable, since he was dead. Further, we find that a portion of the victim's statement falls within the statement against interest exception, since it could have subjected him to criminal penalties. However, because the entire statement was not self-inculpatory, we cannot conclude that the entire statement was admissible as a statement against the victim's interest.
However, we find that the victim's statement was clearly admissible under the state of mind exception, which is one of the traditional hearsay exceptions to prove the state of mind of the declarant. See, State v. Brown, 562 So.2d 868, 877 (La.1990). Whether the declaration is a direct assertion of the speaker's state of mind (hearsay) or whether the declaration tends to indirectly establish the declarant's state of mind (non-hearsay), the declaration is admissible under Louisiana jurisprudence if the declarant's state of mind is at issue or is relevant to prove a fact at issue. Id., citation omitted. According to Brown, this tradition was formally adopted by the legislature in LSA-C.E. Art. 803(3), which provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action. . .
Id., at 877.
Conduct or declarations of the decedent shortly before his killing may sometimes be admissible as tending to show the immediately antecedent circumstances explanatory of the killing and connecting the defendant with it. State v. DiLosa, 529 So.2d 14, 17 (La.App. 5 Cir.1988), writ denied, 538 So.2d 1010 (La.1989), grant of habeas corpus affirmed on other grounds, DiLosa v. Cain, 279 F.3d 259 (5th Cir. 2002), citing, State v. Weedon, 342 So.2d 642 (La.1977). However, hearsay evidence showing the victim's state of mind for the purpose of proving the motive of the defendant is inadmissible, since its prejudicial effect on the defendant far outweighs its probative value as to the victim's state of mind. State v. DiLosa, supra.
In State v. Raymond, 245 So.2d 335, 258 La. 1 (1971), appeal dismissed and cert. denied by Ramos v. Louisiana, 404 U.S. 805, 92 S.Ct. 101, 30 L.Ed.2d 38 (1971), the Louisiana Supreme Court held that, even assuming the victim's statement several hours before his murder was hearsay, it was admissible as state of mind evidence or as res gestae.[6] In Raymond, the victim *988 was with another person, Jackson, when he saw the defendant approaching. He told Jackson that defendant would want him to have homosexual sexual relations with him that night and then hid behind a tree. Id., 245 So.2d at 340. The supreme court noted that one issue in the case was whether the victim and defendant were together on the night of the murder, which occurred several hours after the victim made the statement. The Raymond court found that even assuming the statement was hearsay, it was admissible "[a]s a spontaneous declaration of apparent sincerity. . . under the `Declaration of Mental State' exception to the hearsay rule." Id., citations omitted.
The Raymond court explained:
The need for this type of evidence in a homicide case is apparent. The victim is dead. In many instances, the jury must determine the facts from a mosaic of circumstantial evidence. This is true in the present case. We conclude that the statement was properly admitted in evidence.
Id. at 340.
In contrast, State v. Spell, 399 So.2d 551, 556 (La.1981), held that the Raymond exception was inapplicable where the victim's out-of-court statement only related to the state of mind of the victim two weeks before his death and was not a declaration of the deceased made shortly before his death. See also, State v. DiLosa, 529 So.2d at 17, where this Court held that the testimony of the victim's friend regarding the victim's worry over her and her husband's finances and her fear of foreclosure of the mortgage was inadmissible because it was used more to provide evidence of the defendant's motive to murder the victim [his wife] than to prove the victim's state of mind.
As in Raymond, one crucial issue in the present case was whether the victim was with the defendant at the time of his death. The victim's statement was relevant to establish the victim's future action of riding to Memphis with defendant in defendant's van. This case is distinguishable from DiLosa, since the victim's statement was not used to establish defendant's motive. Further, it was made within hours of his murder, unlike in Spell, when the victim's statement was made weeks prior to the victim's demise.[7] Accordingly, we conclude that the evidence was admissible under the state of mind hearsay exception.
Next, it should be noted that, although defendant vigorously asserted at trial that his rights of confrontation were violated by the victim's statement, he has not explicitly done so on appeal. Specifically, defendant's brief does not even mention Crawford v. Washington, supra. In a paragraph at the end of his assignment of error, defendant makes statements that could perhaps be interpreted to indicate that he was raising the violation of his confrontation rights:
The trial court did not acknowledge the detrimental effect this [Crystal Keeler's] testimony would have on the defendant's right to a fair and impartial trial, to wit: the defendant could not cross-examine the deceased victim as to any *989 statements implicating the defendant in the commission of a drugs-related crime. As such, the defendant was denied his constitutional right to a fair trial and the defendant's conviction should be reversed.
Although arguments not specifically assigned as error are generally considered as abandoned, we will nevertheless construe this limited statement to sufficiently raise the confrontation issue on appeal.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 852, writ denied, 04-1399 (La.11/8/04), 885 So.2d 1118. In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court altered the legal landscape of Confrontation Clause analysis involving hearsay by reexamining its holding in Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Under Roberts, the Confrontation Clause did not bar admission of an unavailable declarant's statement if the statement fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. at 2539.
In Crawford, the State sought to introduce the out of court statement of the defendant's wife as a statement against interest. 124 S.Ct. at 1358. The wife was an unavailable witness because of the spousal privilege. Id. The defendant argued that, notwithstanding state law that allowed the exception, the admission would violate his federal constitutional right of confrontation. Id.
The Crawford court distinguished between nontestimonial and testimonial hearsay. The Court explained that it would be consistent with the Framer's intent to permit the States' flexibility in the development of hearsay law. 124 S.Ct. at 1374. However, with testimonial hearsay evidence, the Confrontation Clause demands that the declarant be unavailable and that there be a prior opportunity for cross-examination. The Crawford court held that the wife's statement to the police was testimonial and was inadmissible, concluding: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." 124 S.Ct. at 1374.
Thus, the first issue is whether the statement at issue in the present case was "testimonial." While the Supreme Court specifically declined to define "testimonial," it recognized that, at a minimum testimonial statements include: "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and police interrogations." Id. at 1374. The Crawford court stated that "testimony" is "`[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 124 S.Ct. at 1364, citation omitted. According to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not. Id. As examples of testimonial statements, the Crawford court lists affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. The Supreme Court also refers to statements that were made under circumstances that would lead an objective witness reasonably to believe that the statement *990 would be available for use at a later trial. Id. at 1364, citations omitted.
There is currently no published Louisiana jurisprudence that has addressed whether a person's statement to an acquaintance in a private conversation constitutes testimonial or nontestimonial hearsay.[8] The only case out of this Court addressing nontestimonial hearsay in a post-Crawford setting is State v. Arita, 04-39 (La.App. 5 Cir. 3/1/05), 900 So.2d 37, where this Court held that a latent fingerprint was non-testimonial hearsay.
In Horton v. Allen, 370 F.3d 75 (1st Cir.2004), cert. denied, ___ U.S. ___, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005), the court considered a co-perpetrator's statement during a private conversation and found that it was non-testimonial hearsay. Horton also held the statement was admissible under the state of mind exception to the hearsay rule. There, a witness testified in Horton's murder trial that Christian, a co-perpetrator, said on the day of the murders that he [Christian] had asked the victim for drugs on credit and the victim had refused. Id. at 83. After discussing Crawford descriptions of testimonial statements, the Horton court held that Christian's statements were not testimonial within the meaning of Crawford because they were not made under circumstances in which an objective person would think that the statement would be available for use at a later trial. Id. at 84.[9] Thereafter, the Horton court held that Christian's statements did not violate Horton's Confrontation Clause rights under Ohio v. Roberts because Christian was unavailable and because the state of mind exception was a firmly rooted hearsay exception. Id. at 85.
In the present case, as in Horton, we find that the victim's statements to his girlfriend were nontestimonial. The statements do not come within the purview of any of the classes of testimonial statements mentioned in Crawford. And, we fail to find that these statements, which were made in a private conversation, were made under circumstances in which an objective person would reasonably think that the statements would be available for use at a later trial.
The next question is whether the analysis in Ohio v. Roberts continues to apply to non-testimonial hearsay. The Crawford court did not clearly provide an answer to that question. Regarding nontestimonial hearsay, the Supreme Court stated that ". . . it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law  as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 124 S.Ct. at 1374.[10] In State v. Arita, supra, this Court applied Roberts to determine the admissibility of nontestimonial *991 hearsay [the latent fingerprint], under the Confrontation Clause. Id. at 45.
In this case, we find Ms. Keeler's testimony regarding the victim's statement meets the two-prong Roberts analysis to the nontestimonial hearsay. First, the victim was clearly unavailable, since he was dead. Additionally, we find that the victim's statement falls into a firmly rooted hearsay exception, considering that Louisiana has traditionally recognized state of mind evidence as an exception to the hearsay rule. See, State v. Brown, supra. See also, Horton v. Allen, ("The state-of-mind exception has been recognized by the Supreme Court and the SJC [Supreme Judicial Court of Massachusetts]." Id. 370 F.3d at 85.
It is noted that this Court has recognized that a violation of a defendant's right to confrontation is subject to a harmless error analysis. See, State v. Arita, supra; State v. Williams, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, 1102, writ denied, 05-0081 (La.4/22/05), 899 So.2d 559, (applying harmless error analysis to inadmissible testimonial hearsay of an accomplice). However, because we conclude that the evidence in this case was properly admitted, it is not necessary to conduct a harmless error analysis.
This assignment of error is without merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following matter requires corrective action by this Court:
It is noted that the verbal post-conviction relief advice given to defendant at sentencing was incomplete because the trial judge failed to state when the period would begin to run. In addressing this type of error, this Court has remanded the case to the district court and ordered it to inform the defendant of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this Court's opinion and to file written proof that defendant received the notice in the record. See, State v. George, 99-887 (La. App. 5 Cir. 1/4/00), 751 So.2d 973, 975.

CONCLUSION
Accordingly, for the reasons assigned herein, the conviction and sentence of defendant, Van Leonard, is affirmed. The case is remanded to the trial court with instructions as stated previously herein.
AFFIRMED; CASE REMANDED WITH INSTRUCTIONS.
NOTES
[1] For the sake of brevity, this paragraph is based on the testimony of the multiple officers who testified about the search of defendant's house.
[2] It is unclear from Washington's testimony whether defendant and Travis arrived together and which individuals went to eat at Popeye's.
[3] It is noted that the record reflects the trial date had been continued several times because Ms. Keeler's presence could not be secured. It is also noted that, on June 21, 2004, the State filed into the record a letter that reflected Ms. Keeler would testify in accordance with her prior statements and that the State would give her immunity.
[4] It is noted that while the transcript refers to the case as "Carper v. Washington," it is clear from the context of the discussion that defendant was referring to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), decided in March of 2004.
[5] It is noted that defendant asserted that the statement constituted other crimes evidence in his motion for new trial, which the trial court denied. Defendant does not contest the trial court's ruling in this regard. It is further noted that defendant obviously had actual notice of Ms. Keeler's statements, considering that he filed a pre-trial motion to exclude them. It is also noted that the record reflects that the State supplied defendant with the tapes of her statements in discovery approximately two months before trial.
[6] Although Raymond and some of the other cases cited herein were prior to the effective date of the Code of Evidence in 1989, we find that this jurisprudence is still applicable to interpret the state of mind exception. See, the 1988 Official Revision Comment to Article 803(3)(a), which provides that Paragraph (3) clarifies prior Louisiana law and generally follows Federal Rule of Evidence 803(3).
[7] The statement was made around 7:00 p.m. and the coroner testified that the victim died sometime prior to midnight.
[8] In State v. Leonard, 04-1609 (La.App. 1 Cir. 4/27/05), ___ So.2d ___, 2005 WL 1039635, the court held that a coroner's report was not "testimonial hearsay."
[9] See also, State v. Mason, 110 P.3d 245 (Wash.App.2005), in which the court recognized that the purpose for which the statements were made is central to a determination of whether out-of-court statements are testimonial. There the court held that a victim's out of court statements were admissible in defendant's murder trial because the statements were made for the purpose of seeking protection.
[10] United States v. Hendricks, 395 F.3d 173 (3rd Cir.2005), n. 7, recognized that some commentators have suggested that this statement indicates Crawford may completely abrogate Roberts and exclude nontestimonial statements entirely from the ambit of the Confrontation Clause, but stated that [s]uch a development in Sixth Amendment jurisprudence was beyond the province of this court."